## PARKER *v.* WALKER.

### (*Jackson.* May 5th, 1888.)

REAL ESTATE BROKERS. *Commissions allowed.*

A broker, who agrees for compensation "to procure a purchaser" for lands, has earned his commissions when he effects a valid *written* contract for sale of the lands, upon terms and with a purchaser acceptable to the owner. Neither the purchaser's refusal to perform his contract upon grounds not imputable to the broker's fault, nor the voluntary failure of the vendor to compel him to do so, will defeat the broker's claim for commissions.

Cases cited and approved: 12 Gray, 491; 101 Mass., 255 (3 Am. Rep., 349); 56 N. Y., 238; 13 Bush, 358; 53 Ind., 294 (21 Am. Rep., 192); Royster *v.* McGeveny, 9 Lea, 148.

(See Gilchrist & Martin *v.* Clarke, *post*, p. 583.)

---

FROM SHELBY.

---

Appeal in error from Circuit Court of Shelby County. L. H. ESTES, J.

JOHN D. MARTIN for Parker.

POSTON & POSTON for Walker.

LURTON, J. This case was heard upon an agreed state of facts, from which it appears that the plaintiff, a real estate broker, *agreed to procure a*

*purchaser* for certain property at $12,300, and to take $300 for his commission as compensation. In pursuance of this agreement, Parker did find a number of gentlemen who agreed to take the property together at the price the owner was willing to take. A written agreement of purchase was drawn up at the suggestion of Parker by the attorney of Walker, and signed by Walker and the purchasers so procured by the broker.

Twenty days were given within which the purchasers should examine the title and reject same if unsatisfactory. This agreement was a definite agreement to consummate the sale if title was sound, and being signed by the parties, was valid under the statute of frauds, and enforcible in equity by a bill for specific performance by either party. The purchasers, within the time allowed by the contract, consulted counsel as to the title, and being advised that it was defective, declined to carry out their agreement.

Walker caused a bill to be prepared to enforce performance, and notified the purchasers that it was his purpose to compel performance of their agreement, but, for reasons not stated, did not file his bill, and abandoned his purpose to hold the purchasers to their bargain. Parker, under this state of facts, insists that he has done all he was obligated to do by his employment, and that he is entitled to his commissions. Walker, upon the other hand, resists payment, upon the ground that no sale has been made, and that the refusal of

the purchasers to complete the purchase has caused
the failure of the negotiations, and that he is not
bound to compel a specific performance, but may
drop the matter as an unsuccessful effort to make
a sale, for which he owes nothing to the broker.

This view of the matter was taken by the Cir-
cuit Judge to whom the issues of law and fact
were submitted, who rendered a judgment for the
defendant.

The controversy turns upon the extent of the
obligation undertaken by one who assumes to act
as a broker, and the duty which he agrees to
perform. "A broker," says Judge Story, "is an
agent who is employed to negotiate sales between
the parties for a compensation in the form of a
commission. In the proper exercise of his func-
tions he does not act in his own name but only
as middle-man." Story on Contracts, § 344.

In his work on agency he defines a broker as
"one who makes a bargain for another, and re-
ceives a commission for so doing. Properly speak-
ing, a broker is a mere negotiator between the
other parties." Story's Agency, § 28.

In the substantial correctness of this definition
all the authorities concur. The office he under-
takes is to bring the buyer and seller to an
agreement, or, as some of the cases put it, he
undertakes to produce a purchaser willing and able
to enter into an agreement of purchase upon the
terms of the seller. This general obligation which
he assumes or undertakes, may of course be varied

by contingencies and broadened or narrowed by specific contract.

In the case now under consideration, the very terms of the agreement between the owner of the property and his agent only required the latter to "procure a purchaser," and the particular agreement conforms to the very definition of a broker's general contract and undertaking. "To procure a purchaser" of real estate, not only implies that the purchaser shall be one able to comply, but the further idea that the seller and the purchaser must be bound to each other in a valid contract. To this much we agree. An oral agreement upon the part of the purchaser would not be a valid agreement; and if he refused to complete the sale after such oral agreement, without fault upon the part of the seller, the obligation of the broker would not be fulfilled, and he could not recover his commissions. If, on the other hand, the purchaser was not only able but willing to complete the sale, and the vendor then refused to sell, or is unable to fulfill the terms upon his part, or make a good title, or the trade falls through for any other default upon the part of the seller, the commissions are nevertheless earned. Addison on Contracts, (Morgan's Ed., Vol. II., Sec. 931); *Cooke* v. *Fiske*, 12 Gray, 491; *Toombs* v. *Alexander*, 101 Mass., 255 (S. C., 3 Am. Rep., 349); *Mooney* v. *Elder*, 56 N. Y., 238.

But if a valid and enforcible agreement be entered into by the purchaser, and he decline to

complete the sale for insufficient reasons, the seller ought not to be allowed to deprive the broker of his commissions by his refusal to compel the performance of a valid contract of purchase. The broker in such case has done all he can do, and all he undertook to do. He has produced a purchaser able to comply, or one satisfactory to the seller, for he has accepted him as a purchaser and willing to purchase; for he has freely bound himself by a valid agreement to buy the property. The subsequent unwillingness to carry out his purchase cannot affect the validity of the agreement by which he has bound himself to take the property. This assent of the contracting parties, and this valid agreement, having been brought about through the intervention of the agent, completes his obligation, and is all he undertook to do, and just what his principal employed him to do. If such a purchaser, being thus bound, undertakes to avoid his agreement upon insufficient legal grounds, the vendor may, if he choose, compel a specific performance; but if he elect to release him rather than to incur the expense, or annoyance, or delay of a litigation, he ought not, in equity and justice, make such election at the expense of his broker. Under the particular engagement entered into between the plaintiff and defendant, and under the general and usual agreement implied from the very definition of the term *broker*, the plaintiff in this case has accomplished just what he undertook to do, and just what the defendant agreed

Parker *v.* Walker.

to pay him for doing. No objection is made, or can be made in this case, as to the ability of the purchasers procured by defendant to comply with the terms of the contract of purchase. Such an objection should have been made before Walker accepted them as purchasers, and bound himself to sell to them. *Royster* v. *Mageveny*, 9 Lea, 148.

The willingness of Walker to accept the purchasers as such, and his satisfaction with the trade, is shown by an extract from the agreed statement of facts: "After their introduction as would-be purchasers, they either would not or could not pay the $12,300 cash which Walker had authorized Parker to sell the property for, but offered to buy it upon the terms specified in Exhibit A (part cash, balance on time). * * * Walker agreed to those terms, and thereupon Parker, being present at said interview, suggested that said agreement be reduced to writing and signed by the parties, both buyers and sellers, whereupon the written contract, Exhibit A, was drafted by Walker's lawyer, and executed by all the parties."

Upon the execution of this agreement of sale nothing more remained that the broker could do, or that he was bound to do. It was for his principal to elect whether he would hold the purchasers to their bargain or release them. If he had chosen to have enforced the agreement, it must be conceded that the broker could have recovered his commissions; can it be, then, that if, on the other hand, his principal preferred to release them that

he can thereby defeat the broker's claim to his reward?

The question as to whether the title of Walker was or was not good, is wholly immaterial. If it was bad, and the sale defeated on that account, the broker, by all the authorities, is entitled to his commissions, unless he was apprised of the defective title, and undertook, with such knowledge, to find a purchaser. The title does, however, from the abstract in the record, appear to have been good, and the objections of the purchasers captious.

The liability of the seller to his broker under such a state of facts seems clear, upon a fair interpretation of the agreement between them. The conclusion which we entertain is supported by considerations of equity and justice to an energetic and useful class of middle-men. That in some cases a hardship will result to would-be vendors, who may, in order to avoid paying commissions, be forced to prosecute a suit to compel the unwilling purchaser to comply with his contract, is not a matter so serious as to determine that the law must, therefore, be otherwise. If a seller prefers to release a purchaser who is morally and legally bound to comply with his bargain, he ought not to complain if the law holds that he cannot do so at the expense of his broker, whose labor and ability have brought about a binding agreement. The weight of authority seems to support the view we have taken. *Coleman's Ex'r* v. *Mead*, 13 Bush, 358;

*Toombs* v. *Alexander*, 101 Mass., 255 (S. C., 3 Am. Rep., 349); *Love* v. *Miller*, 53 Ind., 294 (S. C., 21 Am. Rep., 192).    This last is a well-reasoned case, and the learned Judge refers to a large number of cases as supporting the view here announced, to which we have not had access.

The judgment will be reversed, and judgment rendered here for three hundred dollars and costs.

### DISSENTING OPINION.

The following dissenting opinion was delivered:

FOLKES, J.    I regret that I cannot concur in the opinion of the majority of the Court in the disposition of this cause.

I have always understood that to entitle a real estate agent to his commissions he must effect a sale, or bring the seller a party ready, willing, and able to buy; and when he has done this, and the sale is defeated by defective title of seller, or by the wrongful refusal of seller to comply, or some default on his part which results to defeat the sale, he can recover.

But in the case at bar the seller has a good and perfect title, and is ready, willing, anxious, and able to comply with his contract.    The sale is defeated by the captious, not to say frivolous, objection of the purchasers to the title.    It is indeed not denied that the terms of the deed, which

were seized upon as an excuse for non-performance
on the part of the proposed purchasers, created an
estate-tail, which, under the statute, vested title in
fee in Mrs. Botts.

Moreover, there was a decree of the Chancery
Court, unappealed from, years ago, construing this
to be a good title in fee.

Again, the seller asked for an extension of the
twenty days within which purchaser was to ap-
prove the title, promising to try to obtain quit-
claim deeds from the parties who it was assumed
might have an interest in the property, so as to
remove the objection made to the title.    This was
declined by the proposed purchasers.    All of which
shows that this trade has fallen through for no
possible wrong or default on the part of the seller,
but by the wrongful act of the proposed buyer.

Under this state of facts we are to determine
whether the real estate broker is to onerate the
seller with full commissions as for a *consummated
sale*.

It affords us but little light to read the *defini-
tion* of a broker as given in the books.    We
might as well undertake to determine the liability
of a banker in failing to protest a note made
payable at his office on a day "fixed," where the
maker had removed his residence, by looking to
the definition in the books of a banker.

There is no trouble in defining either the one
or the other; but definition does not determine the
rights and duties under a complicated or exceptional

state of facts. To determine what the liability of the parties is, we must see what their contract was in terms; then ascertain the meaning and intention of the parties at the time the contract was entered into; and, where incomplete in expression, we must learn what equity and good conscience requires, under the circumstances, between the parties.

How would definition help us, and what would become of the broker if his right to compensation —in a case where he had called the attention of a purchaser to land in his hands for sale, and, without ever having brought him to the seller, the seller should seek the party, with knowledge that the broker was engaged in trying to sell to him, and then himself make the sale direct—was made to depend on definition as "one who makes a *bargain* for another, and receives a commission for so doing?"

He has made no bargain, but is honestly trying to do so, when the owner makes the sale in person to the same man.

Under the "definition" he would be entitled to no compensation; but in equity and good conscience, and under all the authorities, he is entitled to his commissions in just such a case. *Sussdorf* v. *Schmidt*, 55 N. Y., 319; *Earp* v. *Cummings*, 54 Pa. State, 394; *Lincoln* v. *McClatchie*, 36 Conn., 136; *Royster* v. *Mageveney*, 9 Lea, 148.

Let us apply this lesson to the case at bar. We find from the agreed statement of facts that

the broker sought the owner, and informed him that he thought he could SELL his land, and would do so for $300 compensation. The owner replied that he must have $12,000 net for his land. Thereupon the broker agreed to procure a *purchaser* at $12,300, and to *take* the $300 surplus for his commissions.

Has the broker done this in *fact* and in *truth*, and as contemplated by the parties to the contract? Confessedly not. He has brought him parties who *agreed*, in writing though it be, to become purchasers, but who have in fact not become so.

Is the property *sold?* Has the owner the $12,300, or any part thereof, out of which the agent can "take" his commissions?

He was to take his compensation out of the *bread* he was to bring him, but, having brought him a *stone* instead, the agent must have bread for his share of the stone.

It is said that he has brought him a "valid agreement" of sale. This is not what was stipulated for. He was to bring him a sale—a purchaser—not a proposed purchaser, nor an agreement of sale.

Can any one suppose that it was contemplated by the parties when the contract between the owner and the agent was made, or when the contract between the owner and proposed purchasers was made, providing for twenty days within which the latter were to determine whether the title was satisfactory, that it was then the intention of the

parties that if the title should be captiously refused, so that the owner would get no purchase-money, that the owner should not only lose the sale, but have to pay out of his pocket the $300, or that to save himself from a positive loss of $300, he must incur a much larger loss by filing a bill or bills in equity for a specific performance of the contract of sale against non-resident parties, or insolvent parties? So that, in any event, he will not receive what he had notified the broker was his main and most anxious care—to wit, $12,000 net.

But it is said that if he had not been willing to sell to non-residents he should have refused to sign the contract of sale. He could not have refused to *sign* on any such ground; if he had declined to sign the contract, he would have then been the cause of the failure of sale, and would have been liable for the broker's commissions on that ground alone.

So that, under well-established authority, he is bound to sign contract of sale, or become liable for fees if his failure to sign defeats sale; and if he signs he is bound to *sue*, at whatever cost or inconvenience, or pay the commissions.

Such a holding, to my mind, is contrary to equity and good conscience—is contrary to the manifest intention and terms of the contract, and virtually makes a contract for the parties which it is manifest the owner never would have made in this case. Under such a rule the broker gathers

38

figs, while the owner is made to gather thistles from the same tree.

But it is said, with apparent plausibility, that if the owner elects to abandon the contract, "he must not make his election at the expense of the broker."

But in thus putting it, we lose sight of the fact that the owner has not elected to *abandon his contract of sale* to the injury of the broker. He has not abandoned his contract at all. If so, he is liable; but he is, on the contrary, ready and willing to perform his *contract of sale.* He has merely concluded not to voluntarily incur the expense and trouble of a suit, never having agreed or promised, directly or indirectly, to bring such suit. So, to assume that he has elected to abandon any duty or contract obligation he was under, at the expense of the broker, is to reason in a circle, or to assume as granted the very point in issue.

Such holding is not only imposing an unexpected hardship upon owners of real estate who have yielded to the importunities of brokers to allow them to sell their lands, but will react upon the business of the broker himself. A man of prudence will regard it unsafe to hold a conversation with a broker, for fear of incurring some new and unexpected liability. And the result would be calamitous in the extreme if an owner, with a good title, must litigate with every party whom a broker can introduce as a purchaser, where the latter interposes some captious or frivolous ob-

jection to the title, if one more frivolous than the present can be found.

But while there are cases to be found supporting the views of the majority, the case at bar, by reason of its special features, does not fall within them; and if it did, these cases from other States are not binding on us, and are persuasive, only so far as they seem to be supported by principle; and for the reasons stated we do not think they should be adopted in this State.

We are by no means without authority for the principles upon which our conclusions are based. Thus, it has been held that "the broker is never entitled to commissions for unsuccessful efforts. He may devote his time and labor, and expend his money with ever so much devotion to the interest of his employer, and yet, if he fails without the default of his principal, he gains no right to commissions." *Sibbald* v. *Bethlehem Ins. Co.*, 83 N. Y., 378.

The broker must find a purchaser in a situation, and able and willing, to *complete* the purchase on the terms agreed on before he is entitled to his commissions.

He must produce a person who is capable and willing to buy the property on the terms named by the seller. This is illustrated by the case of *McGavock* v. *Woodlief*, 20 How., 221.

In Louisiana and Maryland it is held that the making of the contract of sale is not enough, but the sale must actually be made before the broker

may claim commissions. *De Santos* v. *Taney*, 13 La. An., 151; *Kimberly* v. *Henderson*, 29 Md., 512; see also *Blankenship* v. *Ryerson*, 50 Ala., 426; *Hynus* v. *Miller*, 71 Ga., 608.

Successful sale must be the criterion of broker's right to commissions, however meritorious his services, unless the want of success is due to the owner of the land, in failing to do something necessary and proper to the performance of his part of the contract of sale. It is no part of the *obligation* of his contract of sale to file a bill for specific performance. It is a privilege, not a duty or an obligation; and if the broker intends to convert this privilege into an obligation, good faith requires that the proposed seller should be apprised thereof. I apprehend no well-considered case can be found where, under a contract such as the one *disclosed here*, the owner is compelled to pay.

It is not difficult to conceive of a special contract where the owner may move the broker to find for him or bring to him a party with whom the owner may trade, that by the terms or circumstances attending the transaction the broker may be well held to have earned his compensation when he has brought the parties together. Such, however, is not this case.

Can we close our eyes to every-day experience and observation, which tell us that a man may be willing to sell his property for a specified price, and yet not willing to incur the expense and an-

noyance of a suit for specific performance which exposes him to all the hazards of the proposed purchaser becoming insolvent, and of the depreciation, of the market value of the property pending the litigation, when he could avoid all this by selling to some one else so as to "*net him*" according to his expectations, and, in this case, in accordance with express terms of his contract?

It needs no surmise to say that, in the case at bar, if the broker had asked for a contract in terms placing the obligation upon the owner to pursue these purchasers with a bill for specific performance, there would have been no contract made.

Of course it is clearly competent for parties to make such a contract; but I submit that, before such a burthen is placed upon the unwary owner, the energetic, active, and skilled broker should be required to make provision therefor in terms that may convey to the other party some intimation as to the nature of the obligation he is assuming when he consents to permit a broker to undertake the sale of his property.

That innumerable efforts at sale by brokers, which the unreasonable refusal of the proposed purchaser has defeated, have occurred in the county from which this case comes, and in this State, and that this is the first case of which we have any knowledge where the broker has made demand for compensation, furnishes some evidence of the fact that it has never before been supposed

that such compensation was contemplated by the parties.

Believing, as I do, that the holding of the majority is violative of the contract as made by the parties, that it is unsupported by reason and authority, and contrary to public policy, as calculated to force an unwilling party into litigation, I am reluctantly compelled to dissent from the opinion of my much esteemed brethren of the majority.

In my opinion the judgment of the Circuit Court should be affirmed.

Judge Snodgrass also dissents from the opinion of the majority.