Bell, J.,
specially concurring:
I have read and re-read the opinion of the majority of the court in an endeavor to determine whether I should yield to rather well established precedents and join in a judgment which I am convinced carries injustice to the defendants in error, because, perchance, their counsel and the trial court confined the basis of the evidence upon which the judgment rests to limits not justifiable under our appellate court decisions. In other words, if we were permitted to consider the written contract between the plaintiff company and the prospective purchaser, which was wrongfully excluded by the court upon application of counsel for d¿fendants in error, then I should not join in a judgment of reversal. The contract referred to was in writing and duly signed by the plaintiff in error and purchaser, and provided in part that:
“If title is not good as above mentioned,' and cannot be corrected within a reasonable time, then this receipt (contract) shall be null and void, and the $100.00 paid this day to be returned to F. A. Richardson (the prospective purchaser) ;” and also stipulated that the $100 payment received on the purchase price was “taken subject to the approval of the owner.”
*10 On August 27th, 1910, the Realty Company wrote the defendants in error, in part, as follows:
“I have a deposit of $100.00 cash to bind the bargain on your house, 1821 Penn., the balance to be cash on or before ten days, provided abstract shows title perfect and clear of all incumbrance. Please send the abstract at once.” August 29th, 1910, Mrs. Livernash replied to the above letter as follows:
“* * * I am this day mailing the abstract of house at 1821 Pennsylvania to Mr. John H. Gabriel * * *, who has charge of my affairs, and upon whose advise I depend, and any question that may arise, he is able to answer, having attended to the title of the property when it was the estate of my mother, now deceased. The property now stands in the name of myself and two sisters, all of age, and I have asked Mr. Gabriel to havé the abstract brought down to date, and if you will call at his office you may get it. I trust you will find it satisfactory, and if so, all papers can be handled through Mr. Gabriel, who will advise me.”
September 13th,-1910, the company again wrote Mrs. Livernash, in part, as follows:
“I am sorry to inform you that our customer’s attorney reports the title not merchantable. I have turned the attorney’s opinion over to Mr. Gabriel, and I suppose he will report to' you.”
September 19th, 1910, the company further wrote Mrs. Livernash, in part, as follows':
“I have an inquiry for your house for rent. If it is going to take some time to fix up the title it might be well to rent the house until title can be fixed up so it can be sold. I am very sorry that Mr. Richardson’s attorney could not pass the title. I still have some hopes that Mr. Gabriel and he will be able to patch the matter up in some way, but if I can rent the house, subject to sale, it seems to me it would be well to do so. Some of the rooms need papering pretty badly. The rooms in the rear are in the worst condition. The kitchen, two back bed rooms and bath room are pretty *11 badly smoked, but if they are done new the other three rooms will look very badly. If the house were papered and occupied I think it would be easier to sell it than vacant and in the condition it is, and it would not take the rent long to pay for repairs.”
On September 21st, 1910, Mrs. Livernash replied to the above as follows:
“In reply to yours of the 19th inst., if you will furnish me an estimate on repairs for the house I will decide what to do. I have not heard from Mr. Gabriel since my husband’s return from Denver, and have been in hopes he could make some arrangement with Mr. Richardson’s attorney. However, Mr. Gabriel said it would take about ninety days to straighten that flaw in the title, and unless we had a cash deposit binding Mr. Richardson, I do not care about waiting on him, and would prefer to rent it subject to sale. We have always received $25.00 per month rent, and that is what I would ask, and leave it in your hands to collect each month, and if you can get it repaired cheap enough I would be glad to have the rent pay for it, as I have no ready money to put into it. As soon as I hear from you regarding estimates I will let you know what to do, as by then I expect to hear from Mr. Gabriel.”
We hear nothing m.ore of their arrangements or doings until the defendants in error are sued. The evidence shows that from 10 to 30 days after the attorney for the prospective purchaser reported some omissions or so-called flaws in the title, the company, without the knowledge or expressed consent of the defendants in error, returned the $100 payment to the prospective purchaser and surrendered the written contract of sale. It would seem, from the return of the purchase money and contract of sale by the company and the tenor of its letters regarding the renting and future sale' of the house, that the parties mutually understood or were justified in understanding that the tentative sale was voluntarily abandoned by the agent and acquiesced in by the owners. It would seem if the agent wished to insist on *12 any benefits arising from its contract, it should have insisted upon that provision of the contract allowing the owners a reasonable time in which to correct any flaws or omissions in the title. The owners notified the agent, in ample time, that their attorney estimated that it would take about 90 days to correct the flaw. It was a proper matter for the court, under all the circumstances, to determine whether 10, 80 or 90 days were reasonable periods in which to correct and make good the title. The prospective purchaser testified that he demanded the return of his money in about 10 days after the defect .was reported by his attorney, but that he would have taken the property at the same price within a reasonable time thereafter. There is no evidence whatever that the agent insisted upon a performance of that provision in the contract giving a reasonable time within which to correct the title; neither did it notify the owners that any such provision had been made . ,r any such privilege extended to them in the contract. If the agent had fully informed the owners .of the written contract he had made, and had insisted upon the sale he had contracted for being consummated, and had turned over the control of the $100 payment to the owners for their disposition, and had not abandoned and given up the only contract it had made for the sale and the purchase money received to bind it, then it might have had a legal claim for its services. To entitle a broker to a commission for selling real estate, he must show that he has completed the undertaking according to the terms of his contract, or that its completion was prevented, without his fault, by his principal. Mechem on Agency, Sec. 965.
The evidence in this case shows that the owners were anxious to sell, and, upon an objection having been urged to certain omissions in the title, their attorney immediately set about to have the defect corrected, and that the title was quieted in them at the tim.e of the trial of this action. It is suggested in the opinion of the majority of this court *13 that it was not quieted at the time the suit was instituted or the answer filed; however, there is no evidence showing that it could not have been quieted within the estimated 90 days aforesaid if the agent had not voluntarily given up the partial payment and only contract it had made for a sale.
It will be borne in mind that the complaint in this action is most general in its terms, and, in aid of the complaint, there is'filed in the case a bill of particulars which is in the form of a pleading, wherein, among many other things, the plaintiff in error alleges:
“That on or about said day (July 28th, 1910) the said defendants gave to the sard plaintiff, for one hundred and twenty days, * * *, the exclusive agency for the sale of the property * * *, for the price of $3350.00, and agreed to pay said Company a full regular commission in case the property should be sold or exchanged through its agency or otherwise, during said period for that price or at any price accepted by them.
“That thereafter said defendants modified said contract and listed said property with the plaintiff for $3200.00 net, and employed the plaintiff to procure a purchaser therefor, and agreed to pay for its services, all that the property might sell for in excess of the said sum of $3200.00.
“* * * That the plaintiff entered into a written contract with the said Felix A. Richardson, dated August 27th, 1910, for the sale of said property at that price and received the sum of $100.00 as part payment therefor, which said sale -was duly reported to the defendants and accepted by them, and an abstract of title delivered by defendants to plaintiff and by plaintiff to said purchaser. That there- - after the said Felix A. Richardson refused to accept the title to said property for the reason that the same was not a good and merchantable title and could not be corrected within a reasonable time, * *
*14 The defendants treated this formal bill of particulars in aid of the complaint as a part of the complaint and specifically admitted certain allegations and denied other allegations in said bill of particulars, including the allegation that the title to the property “could not be corrected within n reasonable time.”
Whether the allegations in the bill of particulars formally filed in this court as a part of the records of the case and treated by the parties as a part of the formal pleadings can be legally so considered, nevertheless, they may be considered in the nature of admissions of record in the case. The plaintiff in error alleged in said bill of particulars that a written contract for the sale, of the property was made between it and the owners, and afterward modified, and that the title was found so defective that it could not be corrected within a reasonable time. However, there is not a particle of proof in the record to the effect that the title could not be corrected within a reasonable time. No one at any time indicated any doubt as to the equitable title being vested in the defendants in error.' In fact, the evidence tends to show that they and their predecessors in interest possessed the property under a good faith claim under color of title for more than 20 years; therefore, a presumption of grant should be indulged. Also, the attorney of the proposed purchaser simply pointed out some omissions in the recorded title “as disclosed by abstract,” and reported “The property appears to be owned by, and in possession of, three .sisters, Miary E.,- Jennie L. (Livernash) and Margaret Gillis. While I would not say that the title is not good and sufficient to hold the property as against any outstanding claim or title, yet I do not consider it a good merchantable title;” and then shows that the probate of a will under which the defendants in error claim title that it was properly probated in Hamilton County, Ohio, that deeds were made and confirmed by the Ohio court, and that the will should also have been probated in Colorado, as the real estate is situated *15 here. The examiner of the title for the proposed purchaser admits that the probate of the will could be corrected, and then points out that “the will does not empower the executor, as executor, to convey the real estate,” and especially that situated in Colorado, but says that it can be corrected in this state. The examiner of the title also admitted that there was a tax title to the premises, which may and probably does vest a title in the defendants’ predecessors in interest, “which would protect the present owners against any other claim of title,” but expresses his opinion that a tax title is never regarded as a merchantable one until adjudicated by a competent court. The examiner also found that “It is also probable that the present owners could successfully defend their possession under the statute of limitation,” but holds that such a title is not merchantable until judicially determined by a court of competent jurisdiction. In other words, the examiner of the title, while finding the equitable title in the defendants in error, and such as would protect them in the possession of the property as against all others, he, nevertheless, held that, to make the title merchantable as understood in law, certain formal court determinations should first be had.
The general statement of the law in the opinion of the majority of the court, that when a broker procures a purchaser ready, able and willing to buy on the terms stated by the owner, and acceptable to him, he performs his part of the agreement, and does all that he is employed to do, if conceded to be the law, must always be taken with the qualification that the broker shall do nothing to defeat the purchase, or that the sale must not be prevented by the fault of the broker.
The Supreme Court of the. State of Illinois states the rule in the following language:
“The. duty-of a broker, who is employed to sell real estate, is to find and produce to the vendor a purchaser who is ready, willing and able to complete the purchase as proposed. This he must do before he is entitled to any com *16 missions. * * *. If the principal accepts the purchaser thus presented, either upon the terms previously proposed or upon modified terms then agreed upon, and a valid contract is entered into between them, the commission is earned. In such case,- the broker has earned his commission, although the sale is never actually completed, if the failure of the purchaser to complete the sale results from the inability of the vendor to make a good title, and without fault on the part of the broker.” Wilson v. Mason, 158 Ill., 304-310, 43 N. E., 134, 135, 49 Am. St., 162.
The court, in Wilson v. Mason, supra, continues by analyzing three lines of decisions on the rights of brokers, viz.:
“Some of the cases go so far as to hold that the broker is not entitled to his commissions unless the sale is actually accomplished by the delivery of the deed of the land from the vendor to the vendee, and the payment of the purchase money by the latter, or unless it is proven that the sale is prevented by the fault of the vendor. Other cases seem to hold that the broker is entitled to his commissions when the minds of the vendor and purchaser meet in a verbal agreement for the sale by the one and the purchase by-the other of the land. We are not inclined to follow either of these classes of cases, regarding them as extreme and exceptional. The true rule is that the broker is entitled to his commissions if the purchaser presented by him and the vendor, his employer, enter into a valid, binding and enforceable contract. If, after the making of such a contract, even though executory in form, the purchaser declines to complete the sale and the seller refuses to compel performance, the broker ought not to be deprived of his commissions. Hé has done all that he can do when he produces a party who is able, and, in binding form, offers to purchase upon the proposed terms. An agreement by a real estate broker to procure a purchaser not only implies that the purchaser shall be one able to comply, but that the seller *17 and the purchaser must be'bound to each other in a valid contract. So, where the agreement of the real estate broker is to make a sale, his commission is earned when a contract is entered into which is mutually obligatory upon the vendor and vendee, even though the vendee afterwards refuses to execute his part of the contract of sale or purchase,” citing in support of the doctrine Parker v. Walker, 86 Tenn., 566, 8 S. W., 391; Francis v. Baker, 45 Minn., 83, 47 N. W., 452; Love v. Miller, 53 Ind., 294, 21 Am. Rep., 192; Veazie v. Parker, 72 Me., 443; Willes v. Smith, 77 Wis., 81, 45 N. W., 666; Rice v. Mayo, 107 Mass., 550; Christensen v. Wooley, 41 Mo. App., 53; Love v. Owens, 31 Mo. App., 501; Greene v. Hollingshead, 40 Ill. App., 195; Short v. Millard, 68 Ill., 292; Kerfoot v. Steele, 113 Ill., 610; Ward v. Cobb, 148 Mass., 518, 20 N. E., 174, 12 Am. St. Rep., 587.
In Wilson v. Mason, supra, the Illinois court continues as follows:
“An oral agreement upon the part of the purchaser of land would not be-a valid agreement; and if he refused to complete the sale of the land after such oral agreement, without fault upon the part of the seller, the obligation of the broker would not be fulfilled, and he could not recover his commissions,” and cites Parker v. Walker, 86 Tenn., 566, 8 S. W., 391; Middleton v. Findla, 25 Calif., 76; Whitney v. Cochran, 1 Scam., 209; Christensen v. Wooley, 41 Mo. App., 53; “nor would a written agreement be binding upon the purchaser of land, under the Statute of Frauds, if such ah agreement, were signed for him by some other person not lawfully authorized in writing to do so,” citing Cloud v. Greasley, 125 Ill., 313, 17 N. W., 826; McGinnis v. Fernandes, 126 Ill., 228, 19 N. E., 44.
It would seem that the trial court and counsel for defendants in error were governed in their application of evidence by' the principles announced in Wilson v. Mason, supra. The writer is not prepared to’ say that they were nbt justified. It would be unfortunate, indeed, if the highest *18 court of this state should unqualifiedly commit itself to the doctrine that a mere oral agreement between a broker and a proposed purchaser for the sale of realty, or an unauthorized written agreement, that was not enforceable against the purchaser, and never consummated, without fault on the part of the vendor, should entitle the broker to a commission. It is significant that practically all of the cases cited from our appellate courts awarding commissions on the mere finding of a purchaser ready, able and willing to buy on the terms specified were successful on the grounds that the vendor refused to carry out the agreement, or was unable to furnish a merchantable title.
' In the -instant case we think that the case turns upon the failure of the broker to complete its obligation by turning the purchase money and contract of sale over to the owner, instead of turning them back to the purchaser, and abandoning all it had accomplished in the negotiations.
We very much regret to be compelled to accede to a reversal for the technical reason that the written contract of sale was not formally admitted in evidence.