# CHARLESTON.

CHARLES W. WALKER REALTY CO. *v.* CART LAND CO., *a Corp.*

Submitted March 11, 1924.   Decided March 18, 1924.

1.  BROKERS.—*Broker Entitled to Commission, Where Purchaser and Seller Agree to Modified Terms.*

    Where a broker, by virtue of a contract for commissions with his principal, for sale of the principal's land, upon stated price and terms, produced a purchaser who is ready, able and willing to purchase on the terms proposed, or upon terms different therefrom to which the principal agrees, and the seller and purchaser verbally agree upon those changed terms of sale and purchase, the broker is entitled to his commissions whether the verbal agreement be carried into fruition or not; unless the failure to carry out the trade was caused by the purchaser, and not imputable to the seller.   (p. 25).

2.  SAME.—*Exclusion of Evidence of Reason for Repudiating Purchase Outside of Oral Agreement Held Erroneous.*

    Where in such case the buyer and seller both assert that they were able, ready and willing to complete the verbal

agreement by exchanging deeds with payment and acceptance of balance of purchase money, but that each was prevented from so doing by the fault or dereliction of the other; it is error to exclude from the jury evidence that the purchaser had refused to complete the sale and purchase and had declared the deal "off" because of the non-performance of a condition precedent imposed by him and not covered by the verbal agreement, which refusal, made to another person in interest, was communicated to the seller, and upon which the latter acted. (p. 28).

3.    SAME.—*In Suit for Commission Instruction Should Direct Jury to Predicate Verdict on Finding Whether Failure to Consummate Sale Was Due to Defendant or to Purchaser.*

In an action of assumpsit on the common counts by a broker to recover his commissions in such case, where his principal and the party procured by the broker have verbally agreed upon a purchase and sale of the land upon terms different from those authorized to be proposed by the broker, and the seller and purchaser each assert that the failure to consummate the sale was due to the fault of the other, the instructions to the jury should direct them to predicate the verdict upon their finding as to which party was at fault under the evidence and circumstances.    (p. 30).

Error to Circuit Court, Kanawha County.

Action by the Charles W. Walker Realty Company against the Cart Land Company. Judgment for defendant, and plaintiff brings error.

*Affirmed.*

*Morton, Mohler & Peters,* for plaintiff in error.
*B. J. Pettigrew,* for defendant in error.

LIVELY, JUDGE:

The verdict for $1,375 for plaintiff was set aside and a new trial awarded and plaintiff obtained and prosecutes this writ of error.

The declaration is in assumpsit on the common counts, and the claim is for commissions on an alleged sale of lots owned by defendant to George F. Coyle, brought about through the agency of plaintiff under a contract with defendant. Cart Land Company owned sixty-six lots in the John Popp Addition to the city of Charleston, in Kanawha county, twenty-six of which had been sold by contract to various purchasers,

but no deeds therefor had been made. John Popp held a vendor's lien upon these lots, as well as upon the entire Popp Addition. D. M. Blumberg also had a lien (whether by deed of trust or otherwise is not stated) against these lots. Cart, president of the Cart Land Company, being desirous of making a quick sale of these lots in order to pay off the vendor's lien, which was pressing, approached Walker, doing business as Charles W. Walker Realty Company, a real estate broker, for the purpose of obtaining his services in making a sale. They agreed that if Walker would find a purchaser for the forty lots unsold and the equity in the twenty-six lots sold under executory contracts, all for the sum of $27,500, $8,500 of which was to be paid in cash in order to raise money to discharge the vendor's lien, the balance in one, two and three years, Walker should be paid a commission of 5%, and if he sold for more than $27,500 the excess should also be his. This was about April 1, 1921. Walker submitted this proposition of sale to George F. Coyle, a substantial business man of Charleston, who became interested in the purchase of the lots and indicated that he would buy if the terms were changed so he could pay a part of the purchase price by deeding to the seller some real estate which he owned at Spring Hill, in Kanawha county. Walker conveyed this information to Cart, and afterwards Coyle and Cart agreed upon a sale and exchange of their properties. The Spring Hill property was valued at $13.300. The price of the Popp Addition lots was $28,000, and the difference was to be paid in cash, less the amounts which had been paid by the purchasers of the twenty-six lots under their executory contracts. Coyle employed counsel and the title of the Cart Land Company to the lots was examined. It appears that these attorneys found some defect in the title, or at least thought they had found it. The record does not disclose its character. They also found, what all the parties knew to be a fact, the John Popp lien for purchase money and the Blumberg lien. The negotiations extended over some time, probably a month and a half, during which period Popp was participating in the negotiations, and all parties knew of the existence of his lien, and of the fact that he was wanting his money. The deeds were prepared for

the exchange of the properties which deeds were modified and changed two or three times. It appears that Coyle's attorneys prepared one deed which conveyed the entire Popp Addition, reserving therefrom the parts which had theretofore been sold by Cart Land Company, but not excluding the improvements, or that part of the addition between the lots and the river, called in the record "the river front." This necessitated the release of Popp's lien against the entire property, and being a rather startling departure from the terms of the trade, Cart and Popp very naturally objected. Finally, a deed was prepared for the Popp lots, which conformed to the agreement, and it appears that the parties met at Walker's office with the deeds already prepared for closing the transaction, about the middle of May, 1921, the witnesses not being certain about the date or the day of the week. Coyle was accompanied by Dunbar, his counsel. There were also present D. M. Blumberg and his lawyer, Marion C. Gilchrist. Cart and Popp were also there, neither represented by counsel. There were one or two others present who were not produced as witnesses. The deeds were not executed, and the deal did not reach consummation. It appears that Cart went out to the post office, a very short distance away, for the purpose of purchasing revenue stamps to attach to his deed. When he came back he met the others at the foot of the steps, some of whom informed him that the meeting had been adjourned until the following day or the following Monday, for some purpose. The fact is that the conference was adjourned in Cart's absence. There is some controversy over the cause and purpose of the adjournment. Walker says the meeting was adjourned because of the continued absence of Cart. He lays the blame on Cart. Coyle says he was there for the purpose of closing up the deal, exchanging the deeds and paying the difference in money representing the difference in the value of the properties exchanged. He was asked: "Tell the jury why it was the transaction was not closed up there at that time? A. I could not tell you for the life of me, you will have to ask Mr. Cart, for I do not know. I went there to close it up." Popp and Gilchrist say the meeting was adjourned for the purpose of giving more time to Coyle's at-

torney to examine further into the title of the property and
to ascertain if any other liens had been recorded against the
Popp lots subsequent to the time he had made the abstract,
two or three weeks before; also for the purpose of making
corrections in the release of Popp's lien. Popp says he ex-
amined the release which was then presented to him, and
found that it included lots outside of the conveyance, not
corresponding in number with the lots described in the deed,
and also that it released his lien on the river front, that is
on the space of land between some of the lots conveyed and
the Kanawha river. He refused to execute that release until
it was properly drawn. Popp also says he was then asked
to execute an indemnifying bond to Coyle to cover the sup-
posed defect in his title to the land comprising the Popp
Addition. This he refused to do, and he says the conference
was adjourned because of his refusal to execute the release,
and for the purpose of giving time to Dunbar to make fur-
ther examination of the title. Mr. Coyle says he was ready,
willing and able to close the deal but that he left the matter
of the title and releases to his attorneys and was guided by
their advice. Dunbar was examined as a witness, and his
testimony is very indefinite. He did not remember much
about what transpired at the meeting, except that he was
present. He gives no reason why the meeting was adjourned
in Cart's absence. He does not know whether he was to
examine the title for liens and does not remember whether
he again went to the county records for that purpose. He does
not recollect asking for an indemnifying bond at the hands of
Popp. Cart says he went to the post office and obtained the
stamps as quickly as he could, and upon returning met the
parties at the foot of the steps coming out of Walker's office,
and asked Mr. Coyle what was wrong, and received informa-
tion from Coyle and others that the meeting had been ad-
journed. Cart says he was willing and ready to close the
deal and went there for that purpose, and that it was no
fault of his that the meeting adjourned. The parties all
seemed to agree that it was necessary in order to close the
deal that Popp and Blumberg should release their liens so as
to give Coyle a clear title. The adjourned meeting was not

held, and no further negotiations or conferences were had. On the 8th day of June following, Coyle directed his attorneys to demand from Cart performance of the contract, and they did so by registered letter, receiving no reply. Why did not the parties meet again according to the adjournment? It appears that a day or so after this meeting Popp went to the office of Coyle's attorneys and there met Mr. Coyle who wanted him to give him an indemnifying bond, presumably against the alleged defect in the title, and said he would not take the property or close the deal unless that bond was given, and Coyle then left the office. Popp informed McCabe, Coyle's lawer, who was asking him to decide what he would do, that he would let him know that evening or the next morning. Either that evening or the next morning he went to McCabe's office and advised him that he had decided not to give the bond, when McCabe immediately called up Coyle over the telephone and informed him of the decision. McCabe then hung up the receiver and told him that the deal was off unless he would give a bond. He then left McCabe's office and went to Cart and told him that Coyle had refused to take the property and that the deal was off. Coyle admits having the conversation with his attorney and being informed that Popp refused to execute the indemnifying bond and that he told his attorney that he would not take the property. He thinks, however, this declination was had before the meeting at Walker's office, but is not positive. He says that after studying the matter over that evening or possibly the next day or so he changed his conclusion about requiring the indemnifying bond, and communicated his change of mind to Walker. He is not sure about having the conversation with Mr. Popp in McCabe's office relative to the bond. On that point he said: "I don't think I ever said a word to Mr. Popp about the indemnifying bond. Mr. McCabe and Mr. Dunbar were my agents and I expected them to get a clear title to the property, and I did not bother myself to talk to the people who had liens on the property at all." He said that at all times he qualified his acceptance of the trade on what Mr. Blue, Mr. McCabe and Mr. Dunbar said about the title. Cart says that when Popp informed him that Coyle

would not take the property unless the bond was given and Popp had refused to execute· that bond, he considered the deal off, and immediately obtained money elsewhere to pay Popp a sufficient amount on his vendor's lien to satisfy him, and borrowed in all $84,000 (?) from the Charleston National Bank for the purpose of further developing the Popp Addition, sinking wells upon, and sewering the addition; that he never had any information of Coyle's retraction of his demand for the bond, and three weeks or a month later, when he received Coyle's communication through his attorneys, demanding a fulfillment of the contract, he paid no attention to it, having borrowed money and having proceeded to develop the property as above indicated.

The court instructed the jury that if they believed that defendant employed Walker to make sale of the lots at the price and upon the terms and for the commission above set out and that Walker produced a purchaser, Coyle, who was able, ready and willing to buy the lots on terms agreed upon between Coyle and Cart Land Company, then they should find for the plaintiff. The court also instructed the jury that they should not consider the evidence relating to the demand of Coyle and his attorneys for the indemnifying bond at the hands of Popp, telling them that defendant could not defend on that ground. By instruction No. 4, the court also told the jury that plaintiff's claim for commissions could not be defeated if they found that Coyle and Cart had agreed upon the terms of sale and that Coyle was ready, able and willing to buy the lots on those terms, by the refusal and failure of the Cart Land Company to convey the lots. Plaintiff's instruction No. 5 told the jury that the evidence with reference to the negotiations between the parties over the terms of the deed to be delivered by Cart Land Company to Coyle should not be considered if they believed from the evidence that the minds of the parties met, and the terms and provisions of the deed to be delivered by'the Cart Land· Company to Coyle were agreed upon; and by instruction No. 6 the court also told the jury that·the plaintiff·was entitled to recover his commission if they believed that a contract was finally made between the buyer and the seller, regardless of

whether the details of that contract agreed with the original proposition of sale on which Walker was authorized to act.

All of defendant's instructions were refused. Some are abstract, and were objectionable for that reason. One instruction would have told the jury that if they believed that Coyle and Cart had agreed upon the sale and exchange of their properties, but that if the consummation of the deal was postponed after which Coyle directed his attorneys to call off the deal and that this direction was conveyed to Cart, then the agreement for sale was at an end, and any further offer on the part of Coyle to take the property constituted a new offer on Coyle's part, which Cart was at liberty to accept or reject. Other instructions offered would have told the jury to the effect that plaintiff could not recover unless he showed that he had completed his undertaking according to its terms; that he had produced a purchaser ready, able and willing to take the property on the terms stipulated, and that a sale would have been actually consummated unless it was shown that his principal wrongfully refused to close the deal as proposed or wrongfully prevented the consummation of the sale.

The judge came to the conclusion that he had erroneously instructed the jury at plaintiff's instance to the effect that if Walker produced Coyle as a purchaser, and Coyle was ready, willing and able to buy on terms agreed to between him and Cart, then they should find for plaintiff. According to Walker's statement of the verbal contract he, Walker, was to sell the property for at least $27,500, and require a cash payment of $8,500; the remainder on terms, with 5% commission to him and in addition any sum received above the base price. There seems to have been no stipulation that he should have his commission if sale was not actually made. It is very generaally held that if the broker has brought the parties together and as a result they conclude a binding contract, he is not deprived of his commissions because the contract so concluded differs in terms from the one which he was originally authorized to negotiate. *Ice* v. *Maxwell,* 61 W. Va. 9; *Reynolds* v. *Tompkins,* 23 W. Va. 229. If the broker brings to his principal a purchaser who is ready, will-

ing and able to purchase the property on the terms which the broker was authorized to offer, the broker has earned his commissions, if the principal refuses to sell to the buyer. The broker has done all he contracted to do. But should the purchaser not be willing to buy on the terms proposed by the broker, and negotiates for different terms with the purchaser and no sale is effected, the broker is not entitled to his commissions. However, if the principal and buyer, having been brought together through the broker's agency, change the original terms and conclude a contract on different terms, our decisions hold, and it. is very generally held, that the broker should be paid. He has rendered a substantial service to his principal. If there be a contract of purchase and sale on the new terms, and it is not carried out by reason of the fault of the principal, he can not take advantage of his own fault and thus defeat the broker's commissions. If a binding contract be made on different terms between the seller and buyer, the broker is then entitled to his commissions regardless of whether the purchaser refuses to take a deed and carry out the terms of the contract. The broker has performed his service under the terms of his employment. He does not guarantee that the purchaser will not refuse to perform the obligation in full. *McDermott* v. *Gas and Light Co.*, 88 W. Va. 692; *Henreich* v. *Korn,* 4 Daly 74; *Glenworth* v. *Luther,* 21 Barb. 145; *Rice* v. *Mayo,* 107 Mass. 550; *Keys* v. *Johnson,* 68 Pa. St. 42; *Love* v. *Miller,* 53 Ind. 294; *Leckie* v. *Norton,* 43 Conn. 219; *Veazie* v. *Parker,* 72 Me. 444; *Goss* v. *Stevens,* 32 Minn. 474; *Middleton* v. *Findlah,* 25 Cal. 76; *Short* v. *Millard,* 68 Ill. 292.

If the purchaser agrees to the modified terms but refuses to carry out the agreement, and the vendor can not make him do so legally, the fault is not imputable to the principal, and he is not bound to pay the commissions. No benefit has accrued to the principal. It would be otherwise if the agreement could be enforced, for then the seller could not escape payment of the broker's commissions by neglecting or refusing to enforce the contract. But if the consummation be prevented by the seller, if the fault be his, he can not then escape liability, even though the contract be not binding on

the purchaser, the latter being ready, willing and able to carry out the bargain. Such is the import of many of the cases cited by plaintiff. *Hartford* v. *McGillicuddy,* 103 Me. 224; 12 Anno. Cas. 1083; *Gelatt* v. *Ridge,* 117 Mo. 553. In the Gelatt case, Ridge had employed Gelatt in writing to sell his property at a stated price and for a stated commission. Gelatt produced Brady, who was ready, able and willing to buy and who paid $500 down. Ridge met Brady and the contract was agreed upon by them, but not reduced to writing. A tenant was in the property, and Ridge agreed to arrange with him. A day or so later Ridge refused to carry out the contract unless Brady would take the property subject to the lease, which he declined to do. Brady sued for specific performance, and pending the suit he assumed the lease, and a contract was made embodying the terms of the original contract, with the exception that it was made in the name of another Brady. M. J. Brady was substituted for J. F. Brady, the plaintiff in the specific performance suit. The court held that Gelatt was entitled to his commission. He was the procuring cause which resulted in the sale. In *McFarland* v. *Smith,* 2 Ind. App. 160, cited by plaintiff, McFarland employed Lillard in writing to sell his farm on stated terms for a commission. Lillard produced a purchaser who would buy on different terms more favorable to McFarland, to which the latter agreed. A day or so later McFarland refused to execute a deed because his wife was dissatisfied. The court held that Lillard was entitled to his commission, McFarland's fault having prevented consummation of the agreed contract. McFarland could not take advantage of his own fault. In *Holden* v. *Starks,* 159 Mass. 503, cited by plaintiff, the plaintiff as the authorized agent of defendant made a contract to sell defendant's house to one who was willing, able and ready to pay the price and take the property on the terms proposed and who had paid to the agent a part of the purchase money. Defendant refused to make the deed, and it was held that plaintiff was entitled to his commission although the purchaser could not have been compelled to carry out his contract if he had chosen to plead the statute of frauds. It was defendant's fault which prevented consummation.

These cases are all quite different from the one at bar. It is by no means certain that Cart was at fault in refusing to comply with Coyle's demand of June 8, 1921. Acting upon Coyle's declaration that the deal was off because of Popp's failure to give the indemnifying bond, he immediately borrowed money from the bank to meet his pressing necessities and began improving the Popp Addition by arranging for sinking wells and laying sewers. The conditions had changed. Nor does it clearly appear that it was Cart's fault that the deeds were not exchanged at the meeting at Walker's office in May, 1921. He was there for that purpose and interposed no objections or conditions to the completion of the transaction; he had gone to procure revenue stamps to put on his deed, and those remaining in Walker's office left in his absence. No one there was representing Cart. It was not at his instance that the meeting was adjourned. Walker says Cart was gone too long and they thought he would not return. But he did return and met the parties at the foot of the steps as they left. It is quite evident that other causes adjourned that meeting. While it is evident that Coyle was ready, able and willing to carry out the exchange of deeds he was ready to do so when he obtained releases of the liens, and when his attorneys said the title was clear and free from encumbrances. He says he relied on his attorneys. Popp would not sign the release which these attorneys then presented to him, nor would he give the indemnifying bond demanded of him. The evidence largely preponderates that these matters induced the adjournment and prevented the signing of the deeds on that occasion. If the absence of Cart was the moving cause, that cause was removed by his return before the parties left the premises, and when he asked why they were leaving. Following this meeting it is also shown by a preponderance of evidence that Coyle declared the negotiations at an end because of the refusal of Popp to give the bond to indemnify against some supposed defect. Coyle thinks this refusal was before the meeting at Walker's office. He is not certain. Popp says it was after, and is certain. McCabe was not a witness. Could the jury find that Cart was at fault in not closing the deal? Plaintiff's instructions

are misleading. They told the jury that if Coyle was able, ready and willing to buy on the terms agreed upon between himself and Cart, they should find for plaintiff. He was ready, able and willing to buy on June 8th after he had "reconsidered" his demand for the bond and changed his mind in that regard. The question of whether Coyle was at fault or whether the fault was imputable to Cart was not presented to the jury by any of plaintiff's instructions. Moreover, the court told them that they should not consider evidence of Coyle's declination to close the trade. We think this evidence was proper and should have been considered by them. It bore very materially upon the good faith of Cart in attempting to perform his part of the verbal contract. Coyle's statement that he would go no further with the deal was not a confidential communication, and it makes no difference that it was communicated to Cart by Popp. It was a fact admitted by Coyle, and there is no evidence that his change of mind after reconsidering his action was ever communicated to Cart until after he had made arrangements to improve the property. It may be conceded that if Coyle had made such a contract with Cart as could have been enforced by the latter, then plaintiff could have recovered his commissions. But no note or memorandum in writing was signed by him. Many cases hold that a broker is not entitled to his commissions unless the sale is consummated by delivery of the deed; others that he is entitled to his commissions when the minds of the seller and purchaser meet and they verbally agree; other well considered cases hold that the broker is entitled to his commissions where as a result of his agency the buyer and seller enter into a valid, binding and enforceable contract, and then if the purchaser declines to complete the performance and the seller does not make him do so, the broker is entitled to his commissions. In *Wilson* v. *Mason*, 158 Ill. 304, the broker brought the parties together and they contracted by written contract. Afterwards, before formal transfer of the property, a supposed defect in the title (not real) was discovered and the parties cancelled the written contract by marking it "Cancelled". The broker sued for his commissions which the court denied, holding that the written contract made by

the purchasers could not be enforced because signed by them as executors of an estate without authority; and in the opinion it was said:

> "An agreement by a real estate broker to procure a purchaser not only implies that the purchaser shall be one able to comply, but that the seller and the purchaser must be bound to each other in a valid contract. So, where the agreement of the real estate broker is to make a sale, his commission is earned when a contract is entered into which is mutually obligatory upon the vendor and vendee, even though the vendee afterwards refuses to execute his part of the contract of sale or purchase. (*Parker* v. *Walker*, 86 Tenn. 566; *Coleman's Exrs.* v. *Mead, supra; Francis* v. *Baker*, 45 Minn. 83; *Love* v. *Miller*, 53 Ind. 294; *Veazie* v. *Parker*, 72 Me. 443; *Willes* v. *Smith*, 77 Wis. 81; *Rice* v. *Mayo*, 107 Mass. 550; *Christensen* v. *Wooley*, 41 Mo. App. 53; *Love* v. *Owens*, 31 Id. 501; *Greene* v. *Hollingshead*, 40 Ill. App. 195; *Short* v. *Millard*, 68 Ill. 292; *Kerfoot* v. *Steele*, 113 Id. 610; *Ward* v. *Cobb*, 148 Mass. 518)"

The court set aside the verdict because the instructions violated the principle announced in the above case last cited. He held that because Walker did not procure a purchaser who was ready, able and willing to buy on the original terms; and inasmuch as Cart and Coyle did not enter into "a valid, binding and enforceable contract" on terms different from those originally authorized, the instructions given were erroneous.

We think a broker is entitled to his commissions if he produces a *bona fide* purchaser, one who is ready, able and willing to perform the contract as authorized by him to propose, or upon modified or changed terms agreed to between the seller and purchaser, without reference to complete consummation and fruition of the sale, unless the failure to consummate it is chargeable to the purchaser and not to the refusal or fault of the seller, or causes chargeable to him. There is abundant authority for this view. *Philips* v. *Prusch*, 83 Cal. 626; *Vinton* v. *Baldwin*, 88 Ind. 104; *Cassady* v. *Seeley*, 69 Ia. 509; *Coake* v. *Fiske*, 12 Gray, 493; *Gilder* v. *Davis*, 137 N. Y. 504; 20 L. R. A. 398; *Woodall* v. *Foster*, 91 Tenn. 195; *McArthur* v. *Slanson*, 53 Wis. 41; *Koch* v. *Em-*

*merling,* 22 Howard, 69, 16 L. Ed. 292.   On the rule requiring the broker to produce a purchaser who is "ready, able and willing," Mechem in his work on Agency says:

> "A purchaser who will not buy when the time comes, or who changes his mind before the principal can close with him, or who imposes new terms or conditions as prerequisite to the purchase, is not such a buyer as the rule contemplates.  That no sale takes place must, as to this point be the principal's fault, and not the buyer's, in order to entitle the broker to commissions as for a purchaser produced."—§2440, p. 2028.

Whether Cart or Coyle prevented the consummation of the verbal agreement on the terms agreed to by them, should have been submitted to the jury under all the facts and circumstances in determining the right of plaintiff to recover.

The order setting aside the verdict and awarding a new trial will be affirmed.

*Affirmed.*